UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                              :

CAPITAL ACCESS SERVICES INC.,       :
                              :

                  Plaintiff,    :

                              :

        - against -          :

                              :

DIRECT SOURCE SEAFOOD, LLC,     :
ROMAN TKACHENKO, and EVERBANK :
FINANCIAL CORP.,             :

                              :

              Defendants.  :
                              :

-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __6/22/2018__

17-CV-1405 (VSB)

**OPINION & ORDER**

Appearances:

Leon B. Borstein
Avram S. Turkel
Ranadeb R. Mukherjee
Borstein Turkel, P.C.
New York, New York
*Counsel for Plaintiff*

Geri S. Krauss
Krauss PLLC
New York, New York
*Counsel for Defendants Direct Source Seafood, LLC
and Roman Tkachenko*

Craig L. Steinfeld
Anthony J. Sylvester
Sherman Wells Sylvester & Stamelman LLP
New York, New York
*Counsel for Defendant EverBank Financial Corp.*

VERNON S. BRODERICK, United States District Judge:

       Plaintiff Capital Access Services ("CAS" or "Plaintiff") brings this action against

Defendants Direct Source Seafood, LLC ("DSS"), Roman Tkachenko ("Tkachenko"), and

EverBank Financial Corp. ("EverBank") (collectively, "Defendants") asserting claims for breach

of contract against DSS and tortious interference with contract against Tkachenko and EverBank. Defendants move to dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Because (1) DSS did not breach its contract with Plaintiff; (2) Tkachenko acted in his representative rather than personal capacity in causing DSS to enter into an agreement with EverBank; and (3) Plaintiff fails to allege intentional conduct on the part of EverBank or Tkachenko in causing an alleged breach, Defendants' motions are GRANTED.

## I.    **Background**[1]

Plaintiff CAS is a broker specializing in obtaining financing for ongoing businesses. (Am. Compl. ¶ 7.)[2]  Ned Gelband is the President of CAS.  (*Id.* ¶ 8.)  Tkachenko is an officer of DSS.  (*Id.* ¶ 3.)  In August 2014, Gelband and Tkachenko "were introduced to each other by telephone," after which they negotiated the terms of a "brokerage agreement" whereby DSS retained CAS to seek out lenders to extend credit to DSS.  (*Id.* ¶¶ 9–12.)

CAS negotiated with several lenders in New York to seek out financing on behalf of DSS.  (*Id.* ¶ 13.)  As part of its work, CAS found Hudson Valley Bank ("HVB"), which had the potential to extend credit to DSS.  (*Id.* ¶ 15.)  CAS began negotiating with HVB and informed Tkachenko of its negotiations.  (*Id.* ¶ 16.)  In August and September 2014, CAS negotiated a term sheet with HVB through Ken Murphy, who at the time was vice president of HVB's asset-based lending group.  (*Id.* ¶¶ 17–19, 22.)

On September 25, 2014, CAS organized a meeting at HVB's office in New York City

---

[1] The following factual summary is drawn from the allegations of the Amended Complaint, (Doc. 23-1), unless otherwise indicated, which I assume to be true for purposes of this motion.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] "Am. Compl." refers to Plaintiff's Amended Complaint, filed in the Supreme Court of the State of New York, County of New York on February 15, 2017 and attached to the Declaration of Geri S. Strauss as Exhibit A.  (Doc. 23-1.)

attended by Tkachenko on behalf of DSS; Gelband on behalf of CAS; and three members of HVB's asset-based lending group—Murphy, Mark Fagnani (senior executive of HVB's asset-based lending group), and Matthew Owings (senior underwriter of HVB's asset-based lending group) (collectively, the "Murphy Team")—on behalf of HVB. (*Id.* ¶¶ 20–22, 25.) At the meeting, HVB presented the term sheet for the credit facility to DSS, which HVB, DSS, and CAS continued to refine after the September 25, 2014 meeting. (*Id.* ¶¶ 23, 27.)

In addition, at the September 25, 2014 meeting, Tkachenko and Gelband discussed a brokerage fee arrangement between CAS and DSS with HVB. (*Id.* ¶ 24.) During that meeting, Gelband provided Tkachenko with a proposed written memorialization of the fee arrangement, which Tkachenko did not sign at the meeting. (*Id.* ¶¶ 25–26.) On October 1, 2014, CAS and DSS agreed by letter to the fee arrangement proposed by Gelband (the "Brokerage Agreement").[3] (*Id.* ¶¶ 28–29.) The Brokerage Agreement states that DSS "retained [CAS] to assist [DSS] in delivering an acceptable financing facility to DSS." (Brokerage Agreement 1.) It further provides that "[s]hould CAS succeed in the placement of such financing on behalf of DSS," CAS would receive a commission based on certain terms, including, among other things, that: (1) DSS would pay CAS an amount equal to 1% of the total credit facility upon the closing of such financing, (*id.* ¶ 1); (2) the payment would be due and owing to CAS at the time of such closing, (*id.* ¶ 2); and (3) CAS would be entitled to a deposit of $15,000 upon the signing of an acceptable term sheet, (*id.* ¶ 3). The Brokerage Agreement also provides that:

> DSS agrees to compensate CAS at the same rates and terms as those described above, for a period of twenty four months from the date of such initial closing, should any lender involved in such original funding/closing, or have been introduced to DSS through the efforts of CAS, lend to, and/or

---

[3] "Brokerage Agreement" refers to the October 1, 2014 letter agreement between CAS and DSS, attached as Exhibit A to the Amended Complaint. (Doc. 23-1, at 12-13.)

invest in any subsequent financing on behalf of DSS. (*Id.* ¶ 4.)

On October 1, 2014, HVB sent DSS a final deal letter extending DSS $15,000,000 in a senior secured revolving loan facility, to which DSS agreed (the "HVB Loan"). (Am. Compl. ¶¶ 32–33.) DSS wired CAS a $15,000 deposit pursuant to the Brokerage Agreement on the next day. (*Id.* ¶ 34.) After additional meetings at which CAS and HVB further negotiated the HVB Loan and Gelband showed the Murphy Team the Brokerage Agreement between CAS and DSS and discussed its enforceability, HVB closed and funded the HVB Loan on December 9, 2014. (*Id.* ¶¶ 35–37.) Pursuant to the Brokerage Agreement, DSS wired CAS $135,000 on December 11, 2014 for a total commission of $150,000, or 1% of the $15,000,000 HVB Loan. (*Id.* ¶ 38.) After the closing of the HVB Loan, Murphy and Gelband continued to meet in New York City and discussed, among other things, additional financing for DSS. (*Id.* ¶ 40.)

In March 2015, the Murphy Team and other members of HVB's asset-based lending group moved to EverBank's asset-based lending group. (*Id.* ¶ 41.) Around the time of the move, Murphy called Gelband to inform him that the Murphy Team had relocated to EverBank and that the HVB Loan would be owned and serviced by EverBank. (*Id.* ¶ 42.) EverBank currently owns and services the HVB Loan. (*Id.* ¶ 43.)

In the summer of 2016, DSS contacted Murphy while he was at EverBank to request EverBank's extension of a $45,000,000 credit facility to DSS. (*Id.* ¶ 44.) In November 2016, nearly two years after the closing of the HVB Loan, Murphy informed Gelband that EverBank was working to complete a $45,000,000 credit facility to DSS and that the financing would likely close shortly. (*Id.* ¶¶ 45–46.) EverBank—through the work of the Murphy Team—closed and funded the $45,000,000 credit facility for DSS on November 29, 2016 (the "EverBank Loan"),

less than twenty-four months after the closing of the HVB Loan.  (*Id.* ¶ 47.)  Plaintiff believes "EverBank created and allowed closing documents for the [EverBank Loan] to state that there was no broker even though it had knowledge of the [Brokerage Agreement] and that CAS was the broker on this transaction."  (*Id.* ¶ 48.)  DSS paid no commission to CAS in relation to the EverBank Loan, despite CAS's demand for payment at some point after the EverBank Loan closed and was funded.  (See *id.* ¶¶ 47, 49–52.)

## II.    Procedural History

CAS filed its Complaint in New York State Supreme Court, New York County on January 26, 2017.  (Doc. 1 ¶ 1.)  It filed the Amended Complaint on February 15, 2017 alleging that DSS breached the Brokerage Agreement by failing to pay CAS a commission on the EverBank Loan and that Tkachenko and EverBank tortuously interfered with the terms of the Brokerage Agreement.  (*Id.* ¶ 2.)  On February 24, 2017, the case was removed to this court, on the consent of all parties, on the basis of diversity jurisdiction.  (*Id.* ¶¶ 10–19)

On May 12, 2017, Defendants DSS and Tkachenko (the "DSS Defendants") and Defendant EverBank filed separate motions to dismiss.[4]  (Docs. 21, 22.)  Plaintiff filed its opposition to Defendants' motions to dismiss on June 13, 2017.  (Doc. 25.)  EverBank filed its reply on June 28, 2017, (Doc. 29), and the DSS Defendants filed their reply on June 29, 2017, (Doc. 31).

## III.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

---

[4] EverBank deficiently filed its motion to dismiss on May 12, 2017, (Doc. 21), and did not properly file its motion to dismiss and supporting memorandum and declaration until June 27, 2017, (Docs. 26–28).

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Finally, although allegations contained in a complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citation omitted).

## IV. Discussion

### A. Breach of Contract

#### 1. Applicable Law

New York law requires that a plaintiff claiming a breach of contract must allege: "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of

defendant to perform; and (iv) damages."[5]  *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) (citation omitted).  A district court may dismiss a breach of contract claim at the motion to dismiss stage "only if the terms of the contract are unambiguous."  *Id.*  The terms of a contract are ambiguous "if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks omitted).  There is no ambiguity "where the contract language has a definite and precise meaning."  *Id.*

A court's primary objective in interpreting a contract "is to give effect to the intent of the parties as revealed by the language of their agreement."  *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000).  The basic rules of contract interpretation require that "words and phrases should be given their plain meaning and a contract should be construed as to give full meaning and effect to all of its provisions."  *Orchard Hill Master Fund*, 830 F.3d at 157 (internal quotation marks omitted).

### 2.  Application

#### a.  The Brokerage Agreement

Defendants contend that CAS's breach of contract claim should be dismissed based on the plain language of the Brokerage Agreement.  Specifically, they argue that (1) EverBank is

---

[5] The parties to the Brokerage Agreement apparently agree that New York law governs the interpretation of the Brokerage Agreement because they both cite exclusively to New York law.  (*See* DSS Defs.' Mem. 7–8; Pl.'s Opp. 6–7.)  "DSS Defs.' Mem." refers to the Memorandum of Law of the DSS Defendants in Support of Their Motion to Dismiss, filed May 12, 2017.  (Doc. 24.)  "Pl.'s Opp." refers to the Memorandum of Law of Plaintiff in Opposition to Defendants' Motions to Dismiss, filed June 13, 2017.  (Doc. 25.)

neither the original lender nor a lender introduced to DSS by CAS; and (2) any entitlement to a commission with respect to the EverBank Loan is subject to the same "terms" of the Brokerage Agreement that applied to the commission for the HVB Loan.  I agree with Defendants' first argument, and I thus do not address the second.  Because Plaintiff fails to plausibly allege that EverBank was either the "lender involved in [the] original funding/closing," or a lender "introduced to DSS through the efforts of CAS," (Brokerage Agreement ¶ 4), Plaintiff's breach of contract claim is dismissed.

Paragraph 4 of the Brokerage Agreement states:

> DSS agrees to compensate CAS at the same rates and terms as those described above, for a period of twenty four months from the date of such initial closing, should any lender involved in such original funding/closing, or have been introduced to DSS through the efforts of CAS, lend to, and/or invest in any subsequent financing on behalf of DSS.

(*Id.*)  The allegations of the Amended Complaint make it clear that HVB, not EverBank, was the "lender involved in [the] original funding/closing."  There is no dispute that HVB negotiated the terms of the HVB Loan with CAS and DSS, (Am. Compl. ¶¶ 16–23, 27, 35), delivered a final deal letter to DSS on October 1, 2014, (*id.* ¶ 32), and critically, "closed and funded a $15,000,000 credit facility to DSS" on December 9, 2014, (*id.* ¶ 37).  Based on the unequivocal allegations in the Amended Complaint, HVB was clearly the "lender involved in [the] original funding/closing."

Plaintiff argues that EverBank "stood in the shoes of HVB as the 'lender involved' in the 'original closing/funding'" because HVB either sold or assigned the HVB Loan to EverBank, which then serviced it.  (Pl.'s Opp. 7.)  However, the plain language of the Brokerage Agreement is not altered by the fact that HVB may have sold or assigned its rights in the HVB Loan to EverBank, or that EverBank may currently be servicing the HVB Loan.  The cases cited by

Plaintiff do not suggest the contrary. Rather, they simply describe the rights and obligations of an assignee. *See, e.g., In re Enron Corp.*, 379 B.R. 425, 436 (S.D.N.Y. 2007) (noting that "[w]ith respect to assignments, an assignee stands in the shoes of the assignor" and thus "an assignee of a claim takes with it whatever limitations it had in the hands of the assignor" (internal quotation marks omitted)); *Rothberg v. Phil's Main Roofing, LLC*, No. 14-cv-10195 (NSR), 2017 WL 1162904, at *3 (S.D.N.Y. Mar. 24, 2017) (noting that "the assignee is permitted to stand in the shoes of the assignor in order to enforce the contract it has assumed the rights to" (internal quotation marks omitted)). These cases do not provide support for the position that the assignment of a lender's rights in a credit facility transforms the assignee of those rights into the "lender involved in [the] original funding/closing" for purposes of the interpretation of a brokerage agreement to which neither the assignor nor the assignee is a party and which creates no rights or obligations for either the assignor or the assignee.[6]

It also cannot be said that EverBank was "introduced to DSS through the efforts of CAS." (Brokerage Agreement ¶ 4.) It is true that CAS found HVB, and it is not disputed that CAS introduced HVB to DSS within the meaning of the Brokerage Agreement. (*See* Am. Compl. ¶¶ 15–16, 19–23.) It is also true that the HVB employees who were part of the negotiations of the HVB Loan moved to EverBank's asset-based lending group in or about March 2015 and were part of the team that negotiated and concluded the EverBank Loan in November 2016. (*Id.* ¶¶ 41, 44–47.) These allegations do not indicate or support an inference that EverBank was "introduced to DSS through the efforts of CAS." (*See* Brokerage Agreement ¶ 4.) The

---

[6] Plaintiff contends that discovery will reveal that the document effecting the transfer between HVB and EverBank "made EverBank contractually obligated to assume all rights and liabilities of HVB." (Pl.'s Opp. 7.) While that may be the case with regard to the HVB Loan, that would have no impact on my interpretation of the Brokerage Agreement. HVB and EverBank were separate lenders during all relevant times related to the Amended Complaint, and the sale or assignment of the HVB Loan to EverBank did not mean that EverBank became HVB—the "lender involved in [the] original funding/closing."

Amended Complaint alleges that in the summer of 2016, DSS contacted Murphy and his group—who were at EverBank at the time—to discuss the $45,000,000 credit facility. (Am. Compl. ¶ 44.) There are no allegations in the Amended Complaint that even suggest that CAS had any involvement in that communication or generally in bringing EverBank and DSS together. If anything, based on Plaintiff's allegations, the efforts of DSS and/or Murphy, not CAS, resulted in the introduction of EverBank to DSS. CAS made efforts to introduce DSS to HVB, but the Amended Complaint contains no allegations that it made efforts to introduce DSS to EverBank. In fact, CAS did not even learn of the negotiation of the EverBank Loan until several months after DSS contacted EverBank. (*Id.* ¶¶ 44–45.)

To the extent that CAS argues that the Murphy Team's move to EverBank meant that CAS introduced EverBank to DSS, that argument is unpersuasive. Paragraph 4 of the Brokerage Agreement refers to the introduction of a "lender" to DSS. The "lender" in the context of the EverBank Loan was EverBank, not Murphy or any of the other former HVB employees who moved to EverBank. The members of the Murphy Team were merely employees of HVB and subsequently EverBank and cannot be considered "lenders" under the plain language of the Brokerage Agreement.

To the extent CAS contends that its efforts caused the introduction of DSS to EverBank, that argument ignores the series of intervening events that occurred between CAS's introduction of DSS to HVB and the closing of the EverBank Loan, none of which had any connection to CAS. For example, CAS played no role in the departure of the Murphy Team from HVB to EverBank, DSS's initial contact with EverBank, or the subsequent negotiations between EverBank and DSS. Those events disrupted the chain of proximate cause between CAS's introduction of DSS to HVB and the closing of the EverBank Loan, precluding any argument

10

that CAS is somehow entitled to a commission.  *See Moore v. Sutton Res., Ltd.*, No. 96 Civ. 7522(RWS), 1998 WL 67664, at *4 (S.D.N.Y. Feb. 18, 1998) (holding that for a finder to recover under a typical finder's agreement, the finder must "show more than that his service was a necessary but-for condition," must "show that the final deal which was carried through flowed directly from the introduction," and must "establish a continuing connection between the finder's service and the ultimate transaction" (internal quotation marks omitted)), *aff'd*, 165 F.3d 14 (2d Cir. 1998).[7]  Plaintiff's breach of contract claim is therefore dismissed.[8]

### b.  Brokerage Duties

I also find that New York law related to the obligations of a broker prohibits Plaintiff's entitlement to a commission.  New York law distinguishes between the obligations of a "finder" and a "broker."  *Ne. Gen. Corp. v. Wellington Advert., Inc.*, 624 N.E.2d 129, 131 (N.Y. 1993) ("[A] finder is not a broker, although they perform some related functions.").  Brokers are generally obligated to take greater involvement in concluding an agreement than finders in order to earn a fee.  In particular:

> The finder is required to introduce and bring the parties together, without any obligation or power to negotiate the transaction, in order to earn the finder's fee.  While a broker performs that same introduction task, the broker must ordinarily also bring the parties to an agreement.  A broker in New York, unlike a finder, thus carries a defined fiduciary duty to act in the best and more involved interests of the principal. . . . We note that a finder has far less involvement in the ultimate transaction quantitatively and qualitatively, and thus has significantly fewer and different responsibilities to the hiring client.

---

[7] *Moore* dealt with a finder's entitlement to a commission, whereas here, Plaintiff played the role of a broker, which, as I discuss below, requires more extensive involvement in the ultimate transaction for entitlement to a commission. The standard articulated in *Moore* is instructive because if Plaintiff is not entitled to a commission under the more permissive standard for a finder, then it is a fortiori not entitled to a commission under the standard for a broker.

[8] Because I find that Plaintiff has failed to state a claim based on Paragraph 4 of the Brokerage Agreement, I need not address Defendants' argument that the Brokerage Agreement permitted compensation to CAS for the EverBank Loan only on the same "terms" on which it permitted compensation for the HVB Loan.

*Id.* at 131–32 (citation omitted); *see also BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 700 (2d Cir. 1993) (explaining that a broker is "an agent who, for a commission or brokerage fee, bargains or carries on negotiations on behalf of his principal as an intermediary between the latter and third persons in transacting business"). To be entitled to a commission under a brokerage agreement, the broker must be the "procuring cause" of the transaction, and it must act as "a direct and proximate link, as distinguished from one that is indirect and remote, between the bare introduction and the consummation [of the transaction]." *Greene v. Hellman*, 412 N.E.2d 1301, 1307 (N.Y. 1980).

"Distinguishing between a broker and a finder involves an evaluation of the quality and quantity of services rendered." *Wellington*, 624 N.E.2d at 131. The New York Court of Appeals has held that the "dispositive issue" in determining whether a party acts as a broker or a finder rests on "the services agreed to under the contract between the parties." *Id.* at 132; *see also Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 361 (S.D.N.Y. 2016) ("[T]he Court must examine the services agreed to under the contract between the parties, and evaluate the quality and quantity of services rendered." (internal quotation marks omitted)). A court "may determine as a matter of law whether the terms of an agreement require a party to act as a finder or as a broker." *Int'l Techs. Mktg.*, 157 F. Supp. 3d at 361. Therefore, such a determination can be appropriately be made on a motion to dismiss. *See id.* (finding that contract required plaintiff to act as a broker and granting defendant's motion to dismiss breach of contract claim).

I find that the Brokerage Agreement required CAS to act as a broker. As an initial matter, the Amended Complaint alleges that "CAS is a broker specializing in obtaining financing for ongoing businesses." (Am. Compl. ¶ 7.) The Amended Complaint also alleges that Plaintiff and DSS "negotiated a brokerage agreement whereby CAS would broker financing for DSS,"

(*id.* ¶¶ 10, 11), and "[p]ursuant to the brokerage agreement," CAS agreed "to seek out lenders who would extend credit to DSS," (*id.* ¶ 12). The Amended Complaint, therefore, unmistakably alleges that CAS contracted to act as a broker on behalf of DSS.

In addition, the terms of the Brokerage Agreement require CAS to undertake the actions of a broker. For example, CAS must "assist [DSS] in delivering an acceptable financing facility," and CAS may only collect a commission if it "succeed[s] in the placement of such financing on behalf of DSS." (Brokerage Agreement 1.) The Brokerage Agreement, therefore, requires more than simply an introduction; it requires that CAS "bring the parties to an agreement" in regard to an acceptable financing facility before CAS can collect a commission.[9] *See Wellington*, 624 N.E.2d at 131.

There is no dispute that Plaintiff did not fulfill the obligations of a broker with respect to the EverBank Loan. The Amended Complaint contains no allegation that Plaintiff assisted in the negotiation or closing of the EverBank Loan. Indeed, Plaintiff was not aware of ongoing negotiations between DSS and EverBank until Murphy informed Gelband of them in November 2016, just weeks before the EverBank Loan closed. (Am. Compl. ¶¶ 45–47.) Once Plaintiff became aware, there are no allegations that it did anything to assist in the continuing negotiations, and the EverBank Loan closed without any alleged involvement of Plaintiff. (*Id.*) Indeed, the Amended Complaint alleges that CAS only "demanded" a commission after the EverBank Loan closed and was financed, despite being aware of the loan prior to its closing and financing. (*Id*. ¶¶ 45–47, 49–50.) Plaintiff has thus failed to plausibly allege that DSS breached the Brokerage Agreement by failing to pay Plaintiff a commission with respect to the EverBank

---

[9] I note that the Amended Complaint also alleges facts that suggest that the parties understood Plaintiff's role to be that of a broker. For example, Plaintiff negotiated with several lenders on behalf of DSS, (Am. Compl. ¶ 13), including with HVB over the span of several months, (*id.* ¶¶ 16–20, 22–23, 35).

Loan. *See Greene*, 412 N.E.2d at 1308 (holding that broker was not entitled to commission where, even assuming he introduced the parties to each other, "he did not so much as lift a finger to do anything towards" the conclusion of the transaction).

Plaintiff cites a single case—*Strategic Alliance Partners, LLC v. Dress Barn, Inc.*, 386 F. Supp. 2d 312 (S.D.N.Y. 2005)—in an attempt to rebut Defendants' argument that Plaintiff failed to fulfill the obligations of a broker in connection with the EverBank Loan. (Pl.'s Opp. 9.) In *Strategic Alliance*, the court noted that "[a] broker, in order to qualify for a commission, need not necessarily have been involved in the ensuing negotiations or in the completion of the [transaction]." 386 F. Supp. 2d at 317 (quoting *Buck v. Cimino*, 663 N.Y.S.2d 635, 637 (2d Dep't 1997)). Rather, "if the broker does not participate in the negotiations, he must at least show that he created an amicable atmosphere in which negotiations proceeded or that he generated a chain of circumstances that proximately led to the sale." *Id.* Courts in this Circuit interpreting this standard have held that "[i]t in no way relieves the broker of his or her responsibility to bring the parties together on the essential terms of the transaction." *Air Support Int'l, Inc. v. Atlas Air, Inc.*, 54 F. Supp. 2d 158, 167 (E.D.N.Y. 1999). Moreover, in determining that the broker was entitled to a commission, the court in *Strategic Alliance Partners* relied on the fact that the broker separately met with both the buyer and seller to discuss the sale of the property and provided a detailed analysis on how a potential deal could be structured. 386 F. Supp. 2d at 317. The Amended Complaint does not contain a single allegation that suggests Plaintiff ever met with DSS and/or EverBank with respect to the EverBank Loan, or engaged in any efforts whatsoever to assist in the negotiation or closing of the EverBank Loan. Therefore, even assuming that *Strategic Alliance Partners* applies to the facts of this case, I find that Plaintiff did not "create[] an amicable atmosphere in which negotiations proceeded" or

"generate[] a chain of circumstances that proximately led" to the EverBank Loan. Plaintiff's breach of contract claim is therefore dismissed.

### B. *Tortious Interference with Contract*

#### 1. Applicable Law

Plaintiff also brings claims for tortious interference with contract against Defendants Tkachenko and EverBank. "A claim of tortious interference requires proof of (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach, and (4) damages." *Foster v. Churchill*, 665 N.E.2d 153, 156 (N.Y. 1996); *see also Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006). A tortious interference claim requires a breach of the contract between the plaintiff and the third party. *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 495 (N.Y. 1996).

"To impose liability, a defendant must induce or intentionally procure a third-party's breach of its contract with the plaintiff and not merely have knowledge of its existence." *Beecher v. Feldstein*, 780 N.Y.S.2d 153, 154 (2d Dep't 2004). The defendant's conduct must be a but-for cause of the breach. *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990). In addition, "it is well settled that an agent cannot be held liable for inducing its principal to breach a contract with a third person, at least where it is acting on behalf of its principal and within the scope of its authority." *Devash LLC v. German Am. Capital Corp.*, 959 N.Y.S.2d 10, 15 (1st Dep't 2013) (citation omitted). An agent may be acting outside the scope of its authority if its actions are motivated by malice. *See Riddell Sports Inc. v. Brooks*, 872 F. Supp. 73, 78 (S.D.N.Y. 1995) (citing *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir. 1988)).

## 2. Application

Because there was no breach of the Brokerage Agreement, Plaintiff fails to allege a claim for tortious interference with contract against both EverBank and Tkachenko. *See NBT Bancorp*, 664 N.E.2d at 495.

Even if there were a breach, Plaintiff's claims against EverBank and Tkachenko fail because Plaintiff has failed to allege any intentional conduct on the part of EverBank or Tkachenko that could plausibly support a claim that they were a but-for cause of the breach. The only allegations in the Amended Complaint that arguably suggest any intentional conduct by EverBank or Tkachenko are that: (1) "upon information and belief, both Tkachenko and EverBank, jointly and severally induced, directed and/or allowed DSS to make false statements as to the existence of a broker and to breach its contract with CAS and not pay a 1% commission to CAS," (Am. Compl. ¶ 69), and (2) "[u]pon information and belief, EverBank created and allowed closing documents for the [EverBank Loan] to state that there was no broker," (*id.* ¶ 48). Both allegations are conclusory statements devoid of any factual support in the Amended Complaint and therefore cannot plausibly support a claim of tortious interference with contract. *See Iqbal,* 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to survive a motion to dismiss]."). In addition, the second allegation—which refers only to EverBank and not Tkachenko—does not describe a but-for cause of the breach because EverBank did not intentionally procure DSS's breach simply by creating and allowing closing documents to contain a clause stating that no broker was involved in the transaction. The Amended Complaint does not allege any facts that plausibly suggest that EverBank proposed the contractual language at issue, that EverBank induced DSS to sign the contract, that DSS would not have signed the contract without the language at issue, or

that EverBank induced DSS not to pay CAS the 1% commission on the EverBank Loan. Plaintiff's tortious interference claims against EverBank and Tkachenko fail and must be dismissed.

Plaintiff's tortious interference claim against Tkachenko fails for the additional reason that Tkachenko was acting as an agent on behalf of his principal, DSS, and within the scope of his authority when he negotiated and concluded the EverBank Loan. *See Devash*, 959 N.Y.S.2d at 15. The Amended Complaint contains no allegations that Tkachenko acted with malice, not in the best interests of DSS, or outside the scope of his authority. Plaintiff's argument that discovery will show that Tkachenko "personally leveraged promises of future business," (Pl.'s Opp. 14), is a factual allegation that is not contained in the Amended Complaint, nor can it be inferred from the allegations in or the contents of the documents attached to the Amended Complaint. Therefore, I do not consider it in deciding Defendants' motions. *See Chambers*, 282 F.3d at 152.

As such, Plaintiff's tortious interference with contract claims against EverBank and Tkachenko are dismissed.

## V.     <u>Conclusion</u>

For the reasons stated herein, Defendants' motions to dismiss, (Docs. 22, 26), are GRANTED. The Clerk of Court is respectfully directed to enter judgment for Defendants and close this case.

SO ORDERED.

Dated: June 22, 2018
      New York, New York

Vernon S. Broderick
United States District Judge